Margaret Thomas Powe v. Commissioner. William A. Powe v. Commissioner.
Powe v. Commissioner
Docket Nos. 5715-63 and 5716-63.
United States Tax Court
T.C. Memo 1966-40; 1966 Tax Ct. Memo LEXIS 241; 25 T.C.M. (CCH) 218; T.C.M. (RIA) 66040; February 24, 1966
deQuincy V. Sutton, 214 Dixie Towers, Meridian, Miss., for the petitioners. Robert W. Goodman for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in gift tax for the taxable year 1958 of William A. Powe and his wife, Margaret Thomas Powe, in the amounts of $81,668.89 and $82,580.40, respectively. The total deficiency asserted against each petitioner included the deficiency asserted against the other petitioner, the petitioners having signed the consent provided for in section 2513 of the Internal Revenue Code of 1954. The issues for decision are: (1) Whether the transfers by petitioners to a trust known as the "William A. Powe Trust U/A of April 22, 1958," were not in whole or in part, completed gifts *242 as of the end of the year 1958, so as not to be subject to gift tax for that year because of a provision in the trust instrument that certain of the beneficiaries were not to receive any of the income from the trust until debts assumed by the trust were paid in full. (2) Whether there was erroneously included in the value of property transferred to the trust the amount of $156,900 listed on the gift tax return filed by William A. Powe as representing the value of an option agreement transferred to the trust. (3) What was the fair market value of 13,065.2 acres of land on April 22, 1958, the date on which William A. Powe transferred such land to the trust? (4) What is the proper valuation of the amount transferred to the trust in return for the assumption on behalf of the trust of the obligation of William A. Powe to E.Wheeler Bryant which had arisen under an agreement whereby Bryant had performed certain services for Powe? Findings of Fact Petitioners, William A. and Margaret Thomas Powe, are husband and wife, residing in Hattiesburg, Mississippi. During the year 1958 and for some years prior thereto, petitioners resided in Havana, Cuba. Each petitioner filed a gift tax *243 return for the taxable year 1958 with the director of international operations, Washington, D.C., through the office of the district director of internal revenue at Jackson, Mississippi. Each petitioner on the gift tax return for the year 1958 signed a consent to have the gift made by both of them to third parties during that year considered as having been made one-half by each of them. On April 22, 1958, William A. Powe (hereinafter referred to as petitioner) and the Deposit Guaranty Bank and Trust Company of Jackson, Mississippi entered into an agreement under the terms of which petitioner as "Settlor" created an irrevocable trust with the Deposit Guaranty Bank and Trust Company as trustee thereof. Petitioner was born in Mississippi and has at all times since his birth been a United States citizen. In 1929 he went to Cuba and resided there and engaged in business there until sometime in 1960. For more than 15 years prior to the creation of the trust on April 22, 1958, E. Wheeler Bryant (hereinafter referred to as Bryant) was petitioner's agent in Mississippi for the purpose of purchasing and managing property for petitioner in that State. Bryant had a power of attorney from *244 petitioner, granting him authority to buy and sell property in Mississippi for petitioner and to borrow money in petitioner's name to make such purchases. Under this power of attorney from at least 1942 through 1957, Bryant had bought and sold property for petitioner and borrowed money on behalf of petitioner, signing notes as petitioner's agent and disbursing the borrowed funds. Petitioner's agreement with Bryant was that Bryant would be paid a commission on the purchase of property for petitioner and in addition would own a one-tenth undivided interest in the properties which he purchased for petitioner. All of the properties which petitioner transferred to the trust he created on April 22, 1958, were properties in which Bryant had a 10 percent interest under his agreement with petitioner, and in order to satisfy the claim of Bryant to the properties transferred to the trust, and with Bryant's consent which was indicated by his signature to the trust instrument, the trustee was directed in the trust instrument to set aside one-tenth of the trust properties in a separate trust for the use and benefit of Bryant. All of the properties transferred to the trust were listed on Exhibit *245 A to the trust instrument and certain of the properties were listed and described also on Exhibit C attached to the trust instrument. The trust was to be known as the "William A. Powe Trust U/A of April 22, 1958." It provided for the transfer to the trustee of all of petitioner's interests in properties listed on Exhibit A attached to the trust instrument and for the assumption by the trustee of all the debts and encumbrances on such properties as listed on Exhibit B attached to the trust. The instrument stated that the debts assumed by the trustee were incurred in connection with the purchase of the properties transferred to the trust and directed the trustee to pay the debts and liabilities out of either income or corpus, or partly from income and partly from corpus as the trustee in the exercise of its sole discretion might determine to be for the best interest of the trusts created by the instrument. It further provided that until all of the indebtedness assumed by the trustee was paid, the net income from the trust properties would be applied to the cancellation of such indebtedness subject to the provision that Bryant should be entitled to receive in convenient installments one-tenth *246 of the net annual income produced from the properties described on Exhibit C attached to the trust agreement, and that such portion of the income from the properties listed on Exhibit C would not be applied to the payment of interest or principal of any debt presently existing or incurred by the trust. The trust instrument carried the following provisions with respect to the trust established for Bryant: (4) At any time during the life of the said E. Wheeler Bryant he may, by instrument in writing delivered to the Trustee, require the Trustee to convey to him or to such persons as he may direct all or any portion of the property held under this separate trust. The Trustee upon receipt of such notice shall execute and deliver to E. Wheeler Bryant proper deeds and conveyances transferring the legal title to such property to E. Wheeler Bryant or such person as he may direct. (5) The Trustee in its discretion may terminate the interest of E. Wheeler Bryant in this trust and of anyone having an interest in this trust through the said E. Wheeler Bryant by conveying to the said E. Wheeler Bryant or his estate by proper deeds and conveyances the legal title to the property held in this *247 separate trust. Upon such conveyance all interest of E. Wheeler Bryant in this trust shall terminate. (6) In determining the properties to be placed in this separate trust and the income from said separate trust, no deduction shall be made for any indebtedness which is presently a lien against the properties described on the attached Exhibit "C". (7) During the lifetime of E. Wheeler Bryant no portion of any Trustee's fees, ad valorem taxes or other expenses under this agreement are to be paid from the 1/10th of the income from the property shown on the attached Exhibit "C" which is disposed of under the terms of this separate trust. However, all other properties which become a part of this separate trust will bear their proportionate part of all Trustee's fees, ad valorem taxes and other expenses, and after the death of E. Wheeler Bryant the income of this separate trust from the properties described on the Attached Exhibit "C" will bear their proportionate part of such fees and expenses. (8) The provisions of this Article are in full satisfaction of the claim of E. Wheeler Bryant against the properties listed on the attached Exhibit "A" but do not affect any other properties *248 which have been or may be acquired under the agreement between the Settlor and E. Wheeler Bryant referred to above. The trust also excepted from the provisions restricting payment of trust income, a payment of $200 per month provided under the trust to be made to each of petitioner's four sisters during the life of each sister. The instrument further provided that subject to the provision for the payment to each of petitioner's four sisters, the remaining nine-tenths of the trust properties, after the one-tenth allocated to Bryant, was to be set aside and held in three separate trusts: one for petitioner's wife, Margaret Thomas Powe; one for petitioner's daughter, Ellen Thomas Powe; and one for petitioner's son, William Alison Powe, Jr. The trust instrument carried provisions for the payment of income to the three beneficiaries after the debts of the trust had been paid, and provided that upon the death of petitioner's wife any property remaining in the trust created for her benefit should be divided into two equal parts, and one of such parts should be added to the trust created for petitioner's son and the other to that created for his daughter. The trust instrument also provided *249 for a power of appointment in the son and daughter with respect to the property in their trust, but absent such appointment, that such property go to the descendants of such son and daughter or, absent such descendants, to the heirs. It provided for the termination of the trust and distribution of the corpus upon the death of the last to die of petitioner's son or daughter, except if some descendant of petitioner's son or daughter were not 21 years of age at such date, the trust could continue until such descendant reached the age of 21. Broad powers to manage, buy, or sell such property were given to the trustee by the trust. It provided for annual statements to be furnished by the trustee to the beneficiaries of the trust, that the trust be under the jurisdiction of the Chancery Court of Hinds County, Mississippi, that if the trustee resigned, a successor trustee might be appointed upon petition of the beneficiaries to the Chancery Court of Hinds County, and that petitioner retained no powers to alter or amend the trust agreement, this provision being in the following language: (1) Settlor has been fully advised and understands and agrees that this trust is and shall be irrevocable *250 and that after the execution of this trust he shall have no right, title, or interest in or power, privilege or incident of ownership in regard to any of said property and/or money and shall have no right to alter, amend, revoke or terminate this trust or any provision thereof. This agreement also contained the acknowledgment of the receipt by the trustee from the settlor of the properties listed on Exhibit A and the agreement of the trustee to act as such under the agreement and in such capacity to assume the debts and liabilities as set forth on Exhibit B to the trust agreement. The properties listed on Exhibit A to the trust agreement consisted of all of the interest which petitioner had in certain specifically described lands lying in Clarke, Forrest, George, Jackson, Jones, Lamar, Pearl River, and Perry Conties, Mississippi; certain interests in minerals in and under certain tracts of land located in Lamar, Jackson, and Forrest Counties, Mississippi; certain nonproductive royalty interests; certain productive royalty interests; an option agreement; and livestock and farm equipment. The lands transferred included all of the mineral rights which petitioner had therein which *251 in some instances was only a part of the mineral rights. The debts to be assumed by the trustee as shown on Exhibit B to the trust instrument were as follows: An indebtedness of $47,566.66 owing to G. H. Williams, Picayune, Mississippi, secured by deed of trust from William A. Powe to Granville H. Williams, trustee, G. H. Williams, beneficiary, dated February 8, 1957 covering the tract of land known and designated as the G. H. Williams tract in Pearl River County, Mississippi. An indebtedness of $410,409.24 owing to Deposit Guaranty Bank and Trust Company, Jackson, Mississippi, and secured by deed of trust from William A. Powe to Harris B. Henley, trustee, Deposit Guaranty Bank and Trust Company, beneficiary, dated April 21, 1958, and covering all of the properties conveyed by William A. Powe to the Deposit Guaranty Bank and Trust Company, trustee. The properties listed on Exhibit C were the following: Clarke County, Mississippi Lee Estate Tract Forrest County, Mississippi Dixie Tung Oil Company Tract George County, Mississippi Clayton and Walter Mitchell Tract, W. J. Morris Tract Lamar County, Mississippi A. B. Bryant Tract, James Hand Tract, Major-Sowers Sawmill Tract, *252 J. O. Barron Tract The accounting records of the trustee filed with the Chancery Court of Hinds County, Mississippi and approved by that Court showed the initial receipts of property to be as follows: Land: Exhibit C
Lee Estate
$ 4,225.00
Tract
Clayton and
Walter
Mitchell and
W. J. Morris
61,500.00
J. O. Barron
30,125.00
Tract
Total
$ 95,850.00
Exhibit C
Other
Black and
$ 27,900.00
Hathorn
Tract
Sartin Tract
41,705.00
G. H.
50,175.00
Williams
Fornea Tract
9,000.00
Gavin Tract
82,000.00
Stevens
20,000.00
Tract
Total of
230,780.00
other than
Exhibit C
Total Land
$326,630.00
Mineral
Interests: Exhibit C
Dixie Tung
$100,300.00
Oil
7,592.50
382.20
108,274.70
A. B. Bryant
250.00
Tract
Major-Sowers
1,100.00
Sawmill
James Hand
28,080.00
Tract
Total
137,704.70
Exhibit C
Mineral
Other
W. E.
$ 1,800.00
Griffin
Tract
Joe Jones
247.50
Tract
Total Other
2,047.50
than Exhibit
C
Total
139,752.20
Mineral
Interests
Other Land: Purchase
156,900.00
Contract
Cov. Pine
Hill Ranch
Personal
Property: Located on
139,440.00
Pile Hill
Ranch
Book Value
$762,722.20
of All
Assets
Originally
conveyed to
Trustee
Liabilities
Assumed by
Trustee As
per Exhibit
B
Attached to
Trust
Agreement
dated
4-22-58
G. H.
Williams
Principal
$ 47,566.66
Interest to
362.70
4-22-58
$ 47,929.36
Deposit
Guaranty
Bank & Trust
Company
Principal
$410,409.24
Interest to
62.71
4-22-58
410,471.95
Total
$458,401.31
Liabilities
assumed by
Trustee
Net Value of
$304,320.89
Trust on
4-22-58
*253 On his gift tax return petitioner listed the properties described in Exhibit A of the trust instrument and their value, and reported the indebtedness assumed by the Trustee, as follows: Values of the property are as fol-
lows: I. Real Estate and Mineral inter-
ests described in Exhibit "A-1" to
Trust Agreement.
(a) 13,065.2 acres of land
$326,630.00
(b) 7,544 acres of minerals, 270
royalty acres, 76.44 overriding roy-
alty acres
39,452.20
(c) Producing mineral interests
100,300.00
II. Option Agreement between
B. A. Cogle, Sr. and Mrs. Rosa L.
Cogle and William A. Powe de-
scribed in Exhibit "A-2" to Trust
Agreement. Valued at amount of
Escrow fund conveyed and con-
sideration paid for Option Agree-
ment
156,900.00
III. Livestock and farm equip-
ment described in Exhibit "A-3"
to Trust Agreement
139,440.00
Total Value
$762,722.20
Less 10% interest of E. Wheeler
Bryant, conveyed in satisfaction of
legal obligation
76,272.22
$686,449.98
Less debts described in Exhibit
"B" to Trust Agreement
457,925.90
Net value of gift
$228,524.08
The 13,065.2 acres of land reported by petitioner on his gift tax return were described and valued *254 by parcels as follows: 2,460 acres known as Clayton &
Walter Mitchell Tract located in
George County, Mississippi -
$25.00 per acre
$ 61,500.00
1,205 acres less 1/16 royalty inter-
est known as J. O. Barron Tract
located in Lamar County, Missis-
sippi - $25.00 per acre
30,125.00
169 acres known as Lee Estate
Tract located in Clarke County,
Mississippi - $25.00 per acre
$ 4,225.00
800 acres less 1/16 royalty interest
known as Stevens Tract located
in Perry County, Mississippi -
$25.00 per acre
20,000.00
3,280 acres less 2,412/3,280 mineral
interest known as Gavin Tract
located in Perry County, Missis-
sippi - $25.00 per acre
82,000.00
1,668.2 acres less 1/2 mineral inter-
est known as Sartin Tract lo-
cated in Lamar County, Missis-
sippi - $25.00 per acre
41,705.00
1,116 acres less all mineral known
as Black & Hawthorn Tract lo-
cated in Jones County, Missis-
sippi - $25.00 per acre
27,900.00
2,007 acres less 3/4 mineral interest
known as The G. H. Williams
Tract located in Pearl River
County, Mississippi - $25.00 per
acre
50,175.00
360 acres less 1/2 mineral interest
known as Fornea Tract located
in Pearl River County, Missis-
sippi - $25.00 per acre
9,000.00
Total
$326,630.00
*255 The description, number of acres contained in, portion of mineral rights transferred, and name designation of these various parcels of land as shown above are not in dispute, the only issue between the parties being as to the value of the lands on April 22, 1958. The 7,544 acres of minerals, the 270 royalty acres, and the 76.44 overriding royalty acres valued at $39,452.20 did not duplicate any of the minerals underlying the 13,065.2 acres of land transferred by petitioner to the trust. The producing mineral interests were described in Exhibit A attached to the trust agreement as consisting of a royalty interest, being all and every interest in the oil, gas and minerals and royalties acquired by William A. Powe in the Dixie Tung Oil Tract located in Forrest County, Mississippi. Prior to the issuance of the notice of deficiency here involved, a revenue agent, upon investigation of petitioner's gift tax liability, had increased the valuation of this productive mineral interest from the $100,300 shown by petitioner on his gift tax return to $124,700 and this adjustment has not been and is not now contested by petitioner. Under date of August 13, 1957, petitioner, acting through *256 Bryant as his agent, entered into a contract with B. A. Cogle, Sr., and his wife, Rosa L. Cogle, which provided for the sale by the Cogles to Powe of two pieces of property consisting of a total of 8,728 acres of land, sometimes referred to as the Pine Hill Ranch. This agreement was supplemented under date of August 14, 1957, and amended on August 20, 1957. The agreement with the supplement and amendment thereto will hereinafter be referred to as the agreement or contract. The Cogles did not own the land subject to the agreement but had a contract to purchase it from R. L. Zeigler, Inc. The agreement provided for the deposit by petitioner of $156,900 in escrow with a bank, and that petitioner would have the right at any time prior to March 15, 1958, to purchase the property by having the escrow funds released to the Cogles and executing two notes to them, one in the principal amount of $9,157.50 and the other in the amount of $366,300, the notes to be secured by a deed of trust on the property. The agreement also provided a date by which the Cogles were to perfect their title to the property and if the title were not perfected by that date, petitioner would not be obligated to purchase *257 the property but would be entitled to have the escrow funds returned to him. If the title was perfected by the stated date petitioner would forfeit the $156,900 unless he proceeded to exercise his right to purchase the land. The Cogles did not get the title to the land perfected by the required date. However, on March 4, 1958, petitioner notified the Cogles that he did desire to purchase the land on the terms stated in the option and escrow agreement even though under the terms of the option contract he had the right to cancel it. Petitioner transferred all the rights he had under his agreement with the Cogles as of April 22, 1958, including the funds in the escrow account, to the trust and also transferred to the trust the livestock and farm equipment which he had purchased and which were located on the land which was the subject of this contract. On July 10, 1958, a deed was given by the Cogles to the trustee. The trustee, in the various property accounts for the various beneficiaries of the trust, showed on the records of the William A. Powe Trust U/A 4/22/58, under date of July 17, 1958, the following described property as acquired: 1,288 acres of land, more or less, known *258 as the Simmons Place & 7,440 acres, more or less, known as V. A. Anderson Place, also known as the Pine Hill Ranch, all near Purvis, in Forrest County, Miss., being all of the land owned by R. L. Zeigler, Inc. in Forrest County, Miss., & a part of the two places generally known & designated as above stated & containing in the aggregate 8,728 acres of land, more or less. This property purchased for a total cost of $533,692.16. Breakdown of this figure is as follows: Indebtedness assumed with the Connecticut Mutual Life Insurance Company principal $133,262.52. Int. $3,053.91. Total $136,316.43. Indebtedness assumed with Mutual Life Ins. Co. of N. Y. Prin. $28,000.00. Int. $367.50. Total $28,367.50. Cash paid under an escrow deposit
$156,900.00
Cash paid by check at closing
6,474.74
Paid by note & D/T
205,633.49
Total
$533,692.16
When the Cogles acquired the land from R. L. Zeigler, Inc., subsequent to the date the option agreement was entered into, they had assumed mortgages then existing on the land and the agreement between petitioner and the Cogles had been modified to the extent that petitioner was to assume the mortgages which had been assumed by the *259 Cogles and the note petitioner was to give the Cogles as part of the purchase price of the land was to be reduced by the amount of the mortgages he was to assume. Under the assignment of petitioner's rights under his agreement with the Cogles to the trust, the trustee completed the purchase of the land with payment therefor being as indicated in the records of the trustee as set forth above. The records of the trustee contained a separate entry setting forth the value of the livestock and farm machinery. On May 10, 1961, the Deposit Guaranty Bank & Trust Company, Trustee of the William A. Powe Trust U/A of April 22, 1958, filed a petition in the Chancery Court of the First Judicial District of Hinds County, Mississippi requesting approval of the first, second, and third and final accounts, approval of resignation of trustee, and for construction of trust agreement. On January 9, 1961, petitioner's four sisters renounced and disclaimed all of their interest in the trust and agreed to appoint petitioner's wife, daughter, and son as the beneficiaries by last will and testament to receive all of their right, title and interest under the trust. On February 3, 1961, Bryant requested *260 that all of his right, title and interest in and to property in the trust be conveyed to him, and on May 8, 1961, changed that request to request only that under the provisions of paragraph 4 of article II of the trust there be conveyed to him by deed, free and clear of any lien or encumbrance, his undivided one-tenth interest in and to all the gas, mineral and royalty interest held in the trust as described in Exhibit C attached to the trust agreement. In this document Bryant also stated his position that his interest in the trust was unencumbered by any debts. The Chancery Court of the First Judicial District of Hinds County, Mississippi entered a decree accepting the disclaimer of petitioner's sisters to any interest in, and construing the provisions of the William A. Powe Trust U/A of April 22, 1958, approving the Trustee's first annual, second annual, third annual and final account, approving resignation of the trustee, and appointing William A. Powe and his son, William Alison Powe, Jr., as trustees. In this decree the Court stated that the interest of each of the beneficiaries in the corpus of the trust was to be determined under the following formula: E. WHEELER BRYANT
*261 (a) One-tenth (1/10) of the value of Exhibit "C" properties, said value to be determined without deducting from such value any debt secured by liens on said property, and without deducting from such value any debt of any kind, including Trustee's fees, ad valorem taxes, or other expenses of the Trust, plus (b) One-tenth (1/10) of the net value of all other properties originally conveyed to or subsequently added to the Trust. As used in this paragraph and in the following paragraphs net value means value less debts which are secured by liens on the property being valued, and less debts of any kind, including Trustee's fees, ad valorem taxes, or other expenses of the Trust. MARGARET THOMAS POWE (a) One-third (1/3) of the amount obtained by deducting debts secured by a lien on Exhibit "C" properties from Ninety (90) per cent of the value of Exhibit "C" properties, plus (b) Three-tenths (3/10) of the net value of all other property originally conveyed or subsequently added to the Trust. The interests determined for Ellen Thomas Powe and William Alison Powe, Jr., were identical to those determined for Margaret Thomas Powe. The Chancery Court's decree also provided that Bryant's *262 one-tenth interest in the mineral rights listed on Exhibit C to the trust agreement should be transferred to him by the trustee free of any charge or encumbrance in accordance with the provisions of the trust agreement. The following shows the date acquired by petitioner, the mineral interest acquired with the land, price per acre paid, and total price paid for each of the tracts transferred by petitioner to the trust on April 22, 1958: Mineral
Cost
Year
interest
per
Total
Tract
acquired
Acres
acquired
acre
cost
Clayton and
1945
2,460
All
$ 6.00
$ 14,700
Walter
Mitchell
J. O. Barron
1948
1,205
One-half
20.00
24,100
Lee Estate
(Not shown)
169
All
Not shown - pur-
chased from mem-
bers of petitioner's
family
Stevens
1953
800
One-half
40.00
32,000
Gavin
1954
3,280
One-fourth
10.00
32,800
Sartin
1955
1,668.2
One-half
35.00
58,387
Black and
1956
1,116
None
25.00
27,900
Hathorn
G. H.
1957
2,007
One-fourth
50.00
100,350
Williams
Fornea
1957
360
One-half
60.00
21,600
At the date of the trial of this case in 1965, Bryant had been a salaried employee *263 of the Tatum Lumber Company for approximately 48 years. He was a timberland manager for that company. His duties for the Tatum Lumber Company consisted primarily of the purchase, sale, and management of timberlands. In his capacity as an employee of Tatum Lumber Company he would consult with the officers of that company before making a purchase or sale of land. In this respect his activities for Tatum Lumber Company differed from his activities on behalf of petitioner. Commencing by at least 1942 Bryant had the authority under this power of attorney, and did, purchase and sell timberlands and mineral interests for petitioner without previously consulting with petitioner as to the purchase or sale. Although by 1942, Bryant had not had the same amount of experience in the purchase and sale of mineral interests that he had in the purchase and sale of timberland, he did have some experience in the purchase of mineral interests. Acquisition of mineral interests was a factor which Bryant considered in determining the price he was willing to pay for property he purchased for petitioner, and other considerations were the value of the property as timberland and the timber on the land. Bryant *264 would make an offer to purchase timberland at a price which he believed the timber would yield if cut at the time of the purchase, or in some instances, the price the timber would yield plus his estimate of the value of the mineral interest he obtained. Bryant was under no obligation to purchase any particular land or amount of land for petitioner and therefore only purchased land which he considered to be a good buy. At the time Bryant purchased the G. H. Williams tract for petitioner, there was oil activity in the area of that tract and Bryant considered that the one-fourth of the mineral interests he obtained had a value of approximately $10 per acre and that the timber on the land had a value of approximately $40 per acre. The same considerations governed Bryant's purchase of the Fornea tract for petitioner except that he considered the one-half of the mineral interests that he obtained under that tract to have a value of $20 per acre, and the timber, $40 per acre. When Bryant purchased the Stevens tract for petitioner, he considered the one-fourth of the mineral interests which he obtained to be worth $10 an acre. When Bryant purchased for petitioner the Clayton and Walter *265 Mitchell Tract in 1945 he considered the value of the mineral rights he acquired to be greater than the $6 an acre he paid for the land. At the time Bryant bought the Clayton and Walter Mitchell tract there were other lands available at about the same price but because of the continual increase in the price of the land, the price paid for that property makes it appear to be the best bargain of any of the lands Bryant purchased for petitioner which had not been sold at the date the trust was created. After the creation of the trust Bryant continued to assist in the management of the lands under the direction of the trustee. In 1960 the trustee discussed with Bryant the desire of the bank to have the indebtedness to the bank reduced by approximately $100,000. Bryant discussed with petitioner the method of raising the $100,000 and it was decided to cut the timber from certain of the lands owned by the trust. It was decided to clean cut, which means to cut all merchantable timber on sufficient acreage to produce a net amount of $100,000 for payment in reduction of the indebtedness of the trust to the Deposit Guaranty Bank and Trust Company. Bryant would not have recomended clean-cutting *266 these properties in 1960 had it not been for the necessity of raising funds to reduce the trust's indebtedness to the bank. In 1960 and 1961 the timber on the tracts which Bryant decided to clean cut was still in the growing stage and was not at such a stage as to need thinning. The lands which Bryant determined to cut and did cut timber from in 1960 and 1961 were the Sartin, Barron, Clayton and Walter Mitchell, and Stevens tracts. The Sartin and Barron tracts were completely cut over and all of the Clayton and Walter Mitchell tract, except approximately 60 acres, was also clean cut. Approximately one-half of the timber was cut from the Stevens tract but this timber was cut on a selective basis and none of the tract was clean cut. The total gross receipts obtained by petitioner from the timber cut from these tracts in 1960 and 1961 were as follows: Sartin tract
$61,680.41
Barron tract
64,963.48
Clayton and Walter Mitchell
tract
51,618.02
Stevens tract
9,122.81 Although cutting of this timber extended from February 1960 through August 1961, most of the cutting had been completed before the end of March 1961. Total disbursements in connection with the cutting *267 of this timber and cutting of timber from three tracts of land not owned by the trust from which gross receipts of $19,058.07 were received, excluding payments to the Deposit Guaranty Bank and Trust Company, were $118,541.57. Included in this amount were equipment purchases of $24,255.01. The equipment purchased consisted of tractors, trucks, loaders, and similar equipment. After the cutting was concluded this equipment was sold for an amount which is not disclosed in the record. Bryant generally considered that the expense of cutting timber in an operation such as that carried on upon the Sartin, Barron, Clayton and Walter Mitchell, and Stevens tracts was approximately 50 percent of the gross receipts from the timber cut. Although the trees in the area in which petitioner's timberlands were located grow at varying yearly rates depending upon weather conditions, it is generally accepted that the average rate is approximately 5 percent a year. Generally, the major portion of the growth of trees in this area is in the spring and summer of the year. When cutting on the Sartin, Barron, Clayton and Walter Mitchell, and Stevens tracts commenced in February 1960, approximately two growing *268 seasons of timber had elapsed since the lands on which this timber was growing were transferred to the trust and as of April 6, 1961, when this cutting had been substantially completed approximately three growing seasons had elapsed from April 22, 1958. After the timber was cut from the Sartin tract, the tract was cleared and the land reseeded at a cost of approximately $20 per acre. The land was cleared of scrub oak before it was reseeded. After this reseeding work was completed, the tract was divided into two parcels, one of approximately 480 acres which parcel was sold on February 9, 1962, to Frank M. Tatum, Jr., and John M. Tatum. The other parcel of approximately 170 acres was sold on the same date to W. S. Tatum and F. M. Tatum. The four purchasers of this property are members of the Tatum family who own the Tatum Lumber Company, by which Bryant has been employed for approximately the past 48 years. The price paid by the purchasers for each of these tracts was $50 per acre. When this land was sold to the Tatums, the trustee reserved for the trust one-half of the portion of the mineral interests which the trust owned in this property. After land is cut clean, cleared, and *269 reseeded, it is approximately 16 years before pulpwood, which is the smallest class of merchantable timber, can be harvested from the land in the area in which the properties owned by the trust lay, and it is considered generally better timber practice to wait for approximately 20 years before harvesting pulpwood. As of April 22, 1958, standing pulpwood. As of April 22, 1958, standing pulpwood had a value of approximately $5 per cord. The Stevens tract, about one-half of the timber on which was clean cut by petitioner in 1960 and 1961, had been previously cut around 1950 or 1951, prior to the time it was acquired by petitioner, at which time all of the merchantable timber had been taken from the land. About half of the land in this tract is swamp land and supports a hardwood and not a pine timber growth. There was timber on all of the acreage of the Black Hathorn tract at the time it was purchased by petitioner, and as of April 22, 1958, this tract contained approximately 400,000 board feet of merchantable saw timber worth approximately $25 per 1,000 board feet. In addition to the saw timber, this acreage contained pulpwood in merchandtable quantities as of April 22, 1958. There *270 were also some trees below the pulpwood size, sometimes referred to as young growth, on the Black Hathorn tract on April 22, 1958. Land that contains young growth is more valuable than land without this growth. For young growth that results from natural reproduction about 200 trees per acre is considered an excellent stand but for land seeded or planted with seedlings the survival rate to maturity is from 700 to 850 stems per acre. The value of land which has been reseeded or planted with seedlings exceeds that with only natural young growth because of the larger quantity of young growth. In 1958 the value of land generally for timber growing purposes in the area in which the lands petitioner transferred to the trust were located was in the range of from $15 to $20 per acre with natural young growth of approximately 200 stems per acre. This value is without consideration of the merchantable timber and would be increased by any such timber on the land. Land with a stand of young growth of more or less than 200 stems per acre would, because of this factor, be more or less than the average of $15 to $20 per acre without consideration of the merchantable timber. Also, the state of the *271 maturity of the young growth could be such as to cause the value to be higher. Young growth that will become merchantable timber in a few years increases the land value more than young growth in its early stages. The timber on the Black Hathorn tract was fast growing pine. On March 5, 1962, this entire tract was sold to John M. Christian for $55,000. The purchaser of this land owned the land adjoining the Black Hathorn tract. In this sale the vendor retained one-half of the one-fourth mineral interest which the trust had in the property. The timber on the Gavin tract was mostly of the slow growing long leaf pine variety. On April 22, 1958, there was some merchantable timber, primarily pulpwood growing on the Gavin tract. There was some worthless scrub oak trees on all the lands which petitioner transferred to the trust but there were more of these scrub oak trees per acre on the Gavin tract than on any other of the tracts. If timberland is seeded it is advisable to remove the scrub oak which is an added cost in reseeding. During the years 1962 and 1963 the trustees sold nine [1] different portions of the land in the Gavin tract to various individuals. All of these portions, except *272 one, ranged from one-sixteenth of a section (40 acres) to one-fourth of a section (160 acres) and were located adjacent to a public road. On all of the sales of the land the trustees retained a portion of the mineral interest which was acquired with the purchase of the tract. The sales price of the portions of the Gavin tract varied from $42.50 per acre to $75 per acre. The individuals who purchased this land did so with the intention of using it for purposes other than the growing of timber. Some of the individuals who purchased the land cleared it and the cost of clearing it, in some instances, ran at approximately $50 per acre. The land was cleared for reasons other than to sell the timber growing on it, but some of the individuals did sell the timber, and on the average obtained a little over one-half cord of salable pulpwood per acre. The portions of the Gavin tract which the trustees sold during 1962 and 1963 were typical of the other land in that tract except as to location. In February 1962, the trustees sold the entire Lee Estate tract to *273 J. W. McCoy for $10,000. On January 31, 1963, petitioner sold approximately 160 acres of the land in the Stevens tract to J. M. Danos for $9,000, retaining all the mineral interests in the tract. The mineral rights in the Clayton and Walter Mitchell tract have been leased continuously since a few years after this tract was purchased by petitioner. On September 24, 1963, petitioner sold, for $72,000, to J. M. Danos and Richard Danos, 1,800 acres of the land contained in the Clayton and Walter Mitchell tract, which shortly prior thereto the trustees had transferred to him, retaining.8473 of the mineral interests in the property. During the years 1962 and 1963 the trustees sold 15 other small portions of the land in the Clayton and Walter Mitchell tract, the quantities sold in each individual transaction ranging from one-fourteenth of a section to one-fourth of a section and in each instance the trustees retained a portion of the mineral rights in the property sold. The sales price of these various portions of the Clayton and Walter Mitchell tract ranged from $50 per acre to $75 per acre. From 1960 through 1963 the trustees sold two parcels of one-sixteenth of a section and one *274 parcel of 63 acres more or less of the land in the Barron tract at prices per acre ranging around $75 except for a sale made in 1960 to the State Highway Commission of Mississippi conveying 36.74 acres at a price of approximately $100 an acre exclusive of damages. In the sale to the State Highway Commission, the trustee retained all of the mineral interests and in the other sales retained various portions of the mineral interests. Respondent in his notice of deficiency to each of petitioners increased the net value of the gift from the reported amount of $228,524.08 to $591,025.77, which resulted from changing the value of 13,065.2 acres of land from a total value of $326,630 as shown by the return to a total value of $664,179, increasing the value of producing mineral interest from $100,300 to $124,700 in accordance with the increase previously made and agreed to by petitioner (which item is not here in issue), decreasing the reported value of livestock and farm equipment from the amount of $139,440 as reported on the return to $129,440, and making no change in the other two items as reported on the return (the $156,900 reported as the value of the option agreement and the $39,452.20 *275 reported as the value of the nonproducing mineral rights) and reducing both the value of the properties transferred to the trust and the indebtedness assumed by the trust by 10 percent because of the trust created for Bryant. Respondent's valuation of the 13,065.2 acres of land at a total of $664,179 was explaned as follows: County
Young
Total
value
Tract
(Miss.)
Acres
Land
growth
Sawtimber
Pulpwood
at
4-22-58
Clayton and
Walter
Mitchell
George
2,460
$
$12,000.0
$
$
$100,820.
58,500.00
0
25,320.00
5,000.00
00
J. O. Barron
Lamar
1,205
36,150.00
29,520.00
65,670.00
Lee Estate
Clarke
169
5,070.00
1,690.00
6,760.00
Stevens
Perry
800
24,000.00
9,000.00
8,000.00
11,600.00
52,600.00
Gavin
Perry
3,280
82,000.00
24,600.00
65,000.00
171,600.0
0
Sartin
Lamar
1,668
50,046.00
35,873.00
85,919.00
.2
Black &
Hawthorne
[Hathorn]
Jones
1,116
22,320.00
5,580.00
10,000.00
12,000.00
49,900.00
G. H.
Pearl
Williams
Riv.
2,007
60,210.00
15,000.00
27,500.00
102,710.0
0
Fornea
Pearl
Riv.
360
12,600.00
3,000.00
9,000.00
3,600.00
28,200.00
Total
13,06
$350,896.
$70,870.0
$117,713.
$124,700.
$664,179.
5.2
00
0
00
00
00
*276 Ultimate Fact The total fair market value as of April 22, 1958, of the 13,065.2 acres of land transferred by petitioner to the William A. Powe Trust U/A of April 22, 1958, was $531,970 composed of the following values for each of the tracts: Value as of
Tract
4/22/58
Clayton and Walter Mitchell
$ 93,000.00
J. O. Barron
64,500.00
Lee Estate
6,760.00
Stevens
41,000.00
Gavin
82,000.00
Sartin
78,000.00
Black and Hathorn
41,000.00
G. H. Williams
102,710.00
Fornea
23,000.00
$531,970.00
Opinion Petitioner contends that the only completed gift made from the transfer of the various properties to the William A. Powe Trust was the gift to petitioner's four sisters. It is petitioner's position that since there was no completed transfer to any of the other beneficiaries of the trust, the gift tax should apply only to the portion of the property allocable to the gift of a life income interest to each of petitioner's four sisters. The summary of petitioner's argument is that the gift tax reaches only beneficial interests and that the most his wife, Margaret, and his son and daughter could receive under the trust was three-tenths each of the net *277 value after all of the trust's debts had been paid. Petitioner states that the remoteness of these beneficiaries "getting into position for acceptance was measurable directly." Petitioner then argues that these named beneficiaries of the trust were not in a position to be able to accept the gift. Petitioner argues that he intended to divest all his rights in the property only for management purposes and that the benefits to his wife and to his son and daughter were testamentary, not donative. Petitioner cites in support of his contention that the gift tax reaches "only the beneficial interest" the cases of Goodman v. Commissioner, 156 F. 2d 218, 219, (C.A. 2, 1946), affirming 4 T.C. 191 (1944); Estate of Ida Jarvis Pyle, 36 T.C. 1017, 1020 (1961), affd. 313 F. 2d 328 (C.A. 3, 1963); and Chase National Bank, 25 T.C. 617, 621 (1955), modified 259 F. 2d 231 (C.A. 5, 1958). These cases involve situations in which the settlor retained either a right to revoke or amend the trust or some interest in the trust. They are inapplicable in the instant case since petitioner parted with all of his right and interest *278 in all properties transferred to the trust and retained no right to revoke, alter, or amend the trust. Both respondent and petitioner cite the case of Joseph Goldstein, 37 T.C. 897 (1962), in which we held that a completed gift had not been made of the trust corpus under an irrevocable transfer in trust where the settlor of the trust reserved the right in himself to change, substitute, or eliminate beneficiaries of the corpus of the trust. In that case we discussed in detail a number of cases dealing with reservations by the settlor of a trust of rights and concluded that if the settlor retains a power to revoke or amend or to change or eliminate certain beneficiaries presently exercisable over the trust corpus, it prevents the divestment of the dominion and control required for the consummation of a gift. Such a power was distinguished from a power retained by the settlor which would become exercisable only upon the occurrence of an event over which he had no control or with the concurrence of someone having an interest in the trust property adverse to his. Inherent in our decision in that case is the premise that an irrevocable transfer in trust without consideration *279 with no power retained by the settlor to amend, revoke, or change beneficiaries and with no control retained over the trust property does constitute a completed gift even though certain of the beneficiaries may only receive remainder or contingent remainder interests. In the instant case petitioner does not contend that the transfer to any beneficiary other than Bryant was for any form of consideration. Therefore, except as to Bryant, the transfer constituted a gift to the beneficiaries of the trusts. The beneficiaries were not only petitioner's sisters, his wife, Margaret, and his son and daughter, but also unborn descendants of his son and daughter. It is the abandonment of control over the property put in trust which is the essence of a gift. Smith v. Shaughnessy, 318 U.S. 176 (1943). The fact that the property transferred was encumbered affects the value of the property transferred but not whether the transfer constitutes a gift. In Farha Schayek, 33 T.C. 629 (1960), we pointed out that the tax is placed upon the donor's act of making the transfer and not upon receipt of the property by the donee. The tax is measured by the value of the property passing *280 from the donor and not the value of the property received by the donee. Eleanor A. Bradford, 34 T.C. 1059, 1063 (1960). Under the facts here present we conclude that petitioner made gifts of the properties transferred to the trusts except the portion transferred to the trust for Bryant, and that the gift tax is applicable to the transfer except the transfers to the trust for Bryant. The liabilities assumed by the trust are to be considered only in determining the value of the amount transferred. Whether the inclusion in the value of the property transferred to the trust of the amount of $156,900 listed by petitioner on his gift tax return as representing the value of an option agreement transferred to the trust was erroneous is a purely factual question. As petitioner recognizes, the amount as shown by him on his return as the value of the option agreement was not changed by respondent. The value of the personal property and cattle transferred to the trust as shown by petitioner on his return was reduced by respondent. Petitioner now contends that the $156,900 included the amount paid for the personal property and cattle as well as the escrow deposit for this real *281 property. On March 4, 1958, when petitioner notified the Cogles of his intent to purchase the land covered by the agreement of August 13, 1957, a contract between the Cogles and petitioner for the purchase of real property was consummated. At the date of transfer to the trust of this contract to purchase land, there was a deposit of $156,900 in an escrow account which amount was to be turned over to the vendor of the land when the deed to the land was delivered. The $156,900 in the escrow account was transferred to the trust with the assignment to the trust of the petitioner's rights under the contract to purchase the real property. The value of this contract could not be less than the $156,900 in money which was held by the escrow agent at the date the contract to purchase the land was assigned to the trust. In effect this amount in cash was transferred to the trust. [2] It is possible that the value of the contract to purchase the land could be in excess of the $156,900 cash held by the escrow agent, but this issue is not here presented since respondent did not increase the amount as reported on petitioner's tax return. *282 Petitioner's position that the amount of $139,440 reported on his return as representing the value of livestock and farm equipment transferred to the trust was a duplication of the $156,900 held in escrow is not borne out by the facts of record. The inventory of property originally conveyed to the trust as shown on the account filed by the trustee in the Chancery Court of Hinds County and specifically approved by the Chancery Court, as well as the entries made on the trustee's books with respect to the purchase of the land separate from the account of the livestock and farm machinery, bears out the correctness of the reporting by petitioner on his gift tax return of two separate properties transferred to the trust. We therefore conclude that respondent did not err in including in petitioner's taxable gifts for the year 1958, the amount of the $156,900 reported by petitioner on his return as the value of an option agreement, as well as the $139,440 representing the value of livestock and farm equipment. Petitioner also argues that this last amount should be reduced by another $500 but there is no evidence in the record to support this contention by petitioner. Most of the testimony *283 in the record deals with the valuation of the 13,065.2 acres of land transferred by petitioner to the trust. Much of the testimony was by expert witnesses. Some of the witnesses were purchasers of portions of the various tracts of land from the trustees during the years 1960 through 1962. After considering all of this evidence we have concluded that the total value of the land transferred to the trust as of April 22, 1958, was $531,970 and have so found as an ultimate fact. This total is arrived at by valuing the various parcels of land as set forth in our ultimate finding of fact. Petitioner makes the argument that he has shown error in respondent's evaluation and therefore respondent's computation should be rejected. Without precisely so stating petitioner apparently concludes that it follows from the fact that the evidence does not support in full the value determined by respondent, that the value as reported by petitioner should be accepted. This conclusion does not follow. Petitioner's valuation of each tract of land was $25 an acre. The evidence is unequivocal that some parcels of land were more valuable on April 22, 1958, than were other parcels. There is disagreement between *284 petitioner's own expert witnesses and between petitioner's expert witnesses and respondent's expert witnesses as to the value of the various parcels, but the evidence in the record is sufficient to determine with reasonable accuracy the fair market value of each tract of property. There is very little evidence with respect to the Lee Estate tract. Respondent's expert witness testified that he valued this property on the basis of information furnished to him by Bryant when Bryant was showing him over the various properties on behalf of petitioner. We have accepted respondent's determination with respect to that tract since the only evidence in the record supports that value. We have also accepted respondent's determination of the fair market value on April 22, 1958, of the Williams tract. The evidence shows that this tract was purchased by Bryant for petitioner in 1957, approximately a year before it was transferred to the trust and that petitioner paid $100,350 for the tract or $50 an acre. The evidence further shows that Bryant considered at the time this tract was purchased that the one-fourth mineral interest acquired had a value of approximately $10 per acre and that the timber *285 on this land had a value of approximately $40 per acre. The evidence shows that timber grows at the rate of approximately 5 percent per year, and therefore if no other increase in value had occurred in this property between the time it was purchased and April 22, 1958, the timber growth of approximately 5 percent would increase the value of this property. However, Bryant testified to the effect that all during the years commencing back in 1945 when he purchased the Clayton and Walter Mitchell tract and up until the date when he was testifying at the trial of this case in 1965, there had been a continuous gradual rise in land value in the area in which the properties transferred to the trust were located. Considering all this evidence the value as of April 22, 1958, placed on the Williams tract by respondent which is only $2,360 in excess of the price paid therefor by petitioner approximately a year earlier is certainly supported by the record as being the fair market value of the property at April 22, 1958. The Fornea tract was purchased for petitioner at the same time as the Williams tract. It was purchased by Bryant with the same considerations except that he considered the one-half *286 mineral interests under this tract to be worth approximately $20 per acre and the timber $40 per acre. Considering the approximately one-year period that this property was held before it was transferred to the trust, the fact that it was contiguous to the Williams tract, and viewed by petitioner in substance as being a part of that tract, we have concluded that it would not have increased in value between the time it was purchased and the time it was transferred to the trust by much more than 5 percent and have therefore determined its fair market value at the date it was transferred to the trust to be $23,000. The evidence in the record with respect to the Clayton and Walter Mitchell, Barron, Stevens, and Sartin tracts consists not only of testimony by expert witnesses but also of actual evidence of timber cut from these properties in 1960 and 1961, as well as sales of portions of the properties to various individuals in years subsequent to 1958, in most of such sales the trustees reserving all or a portion of the mineral interests which they had in the tract. We have given very little weight to the various sales of small portions of these tracts, not only because of the relative *287 remoteness of the date thereof from the date of the gift, but also because we do not consider the prices received upon the sales of properties in lots of 40 to 120 acres to be indicative of the fair market value of the entire tract as a unit. Since it was the entire tract that was transferred to the trust, it is the entire tract that we are valuing. However, we do consider these sales to be some indication that there was some value to the land apart from the mineral rights and apart from the timber growing thereon since the sales were made in some instances after the timber had all been cut. Petitioner argues that the lands should be valued without consideration of the mineral rights therein which petitioner transferred to the trust. We do not agree with petitioner in this regard. The evidence shows that whatever mineral rights petitioner had in these lands and transferred to the trust were not included either in petitioner's gift tax return or respondent's notice of deficiency in the separate valuation of mineral rights but that those valuations included only mineral rights, the surface rights of which were not transferred by petitioner to the trust. Therefore, in valuing these *288 lands we have considered the fact that petitioner owned and transferred to the trust all the mineral interests in the Clayton and Walter Mitchell tract and a part of the mineral interests in the Barron, Sartin, and Stevens tracts. When Bryant purchased the Clayton and Walter Mitchell tract for petitioner in 1945 he considered there was a value in mineral rights in the property in excess of the amount he paid for the land. In arriving at the fair market value of this tract we have given consideration to the fact that there were some trees growing on the land which were below the merchantable size as of April 22, 1958, as well as merchantable timber on the land. Respondent in his argument has assumed that there would be approximately 10 percent less merchantable timber on the Clayton and Walter Mitchell tract on April 22, 1958, than there was on that land when the timber was cut in 1960 and 1961. Petitioner argues that there would be approximately 20 percent less timber on April 22, 1958, than when the timber was cut. Both parties accept the fact that the rate of growth of the type of timber growing on the lands which were cut over in 1960 and 1961 was approximately 5 percent a year. *289 The evidence shows that the main growth occurred in the spring and summer. From the dates of receipts for timber, it is apparent that the timber was not cut ratably over the entire period from February 1960 to August 1961, but that most of it was cut between February 1960 and March 1, 1961. We have therefore considered that the growth on the average between the date the properties were transferred to the trust on April 22, 1958, and the date the timber was cut was approximately 12 1/2 percent and have estimated the quantity and value of merchantable timber on the Clayton and Walter Mitchell tract and other properties on which cutting took place accordingly. We have also considered the testimony of certain of petitioner's expert witnesses that bare timberlands without any timber growth and without any development or reseeding work, if being purchased for timber growing uses only, without consideration to mineral values or other possible uses for the land, would have a value in the area in which petitioner's lands were located of from $5 to $10 per acre. However, we have not considered that this amount constitutes the fair market value of lands in which all or a portion of the mineral *290 rights were transferred by petitioner to the trust and which contained young growth in most instances when transferred to the trust and which had other potential uses when transferred to the trust. We have recognized that the value to be placed on the lands should give recognition to the young growth and the mineral interests which were transferred to the trust as well as to the bare land value. We have given consideration to all of these factors in the land values we have determined for the Clayton and Walter Mitchell, Barron, Stevens, and Sartin tracts, as well as to our conclusion as to a proper estimate of the merchantable timber on those tracts and the value thereof when they were transferred to the trust on April 22, 1958. In our valuation of the Clayton and Walter Mitchell, J. O. Barron, Stevens, and Sartin tracts we have considered the testimony of the expert witnesses for both petitioner and respondent. To a large extent the variations in their testimony were with respect to the merchantable timber and young growth on the land on April 22, 1958, and our conclusion from all this testimony is reflected in our ultimate finding as to the value of each of these tracts. A substantial *291 portion of the testimony in the record deals with the Gavin tract. Petitioner contends that this was very poor timber growing land and that at the time it was transferred to the trust it had timber growth which would not produce more than one-half a cord of pulpwood an acre and no other merchantable timber. Petitioner's witness testified that the young growth on this land was negligible. The record shows that petitioner owned one-fourth of the mineral interests under the Gavin tract and that in 1954 petitioner had paid $10 an acre for this property. It also shows that this land was well located as to roadways so that it had potential uses for purposes other than timber growing. The evidence also shows that Bryant, when he purchased this land for $10 an acre in 1954, had considered that the one-fourth mineral rights obtained were worth approximately that amount. Petitioners, on their returns, valued this property at $25 an acre for a total value of $82,000. All of petitioner's witnesses including Bryant, indicated that they considered that the Gavin tract had merchantable timber in operable quantities. Considering all of the testimony with respect to this tract we have concluded that *292 its fair market value at April 22, 1958, is the amount of $82,000 as used by petitioner in arriving at the value reported on his gift tax return. The testimony is uniform that the timber on the Black and Hathorn tract was of good quality both as to merchantable timber and young growth. There was at least $10,000 in value of sawtimber on this land as of April 22, 1958, and in addition some pulpwood and a good stand of young growth. Petitioner owned no mineral rights in the Black and Hathorn tract and transferred none to the trust. Considering all of these factors we have determined that the fair market value of the tract when it was transferred to the trust was $41,000. The last issue concerns the portion of the value of the properties transferred to the trust which should be allocated to the trust created for Bryant. Both parties recognize that there was consideration for the transfer to Bryant and that this transfer did not constitute a gift. Both parties also recognize that the value of the total properties transferred to the trust should be reduced by the value of the properties allocable to the trust created for Bryant. The issue is how to arrive at this value. Petitioner *293 contends that one-tenth of the value of the properties transferred to the trust should be subtracted therefrom for the value of the Bryant trust and no other adjustment made. Respondent contends that the gross value of the property turned over to the trust should be reduced by 10 percent representing the property in the Bryant trust, but that the indebtedness assumed by the trust should also be reduced by 10 percent representing the indebtedness applicable to the portion of the property transferred to Bryant. The parties argue this issue as if it had to do with the amount of indebtedness to be used as a reduction of the total value of the property transferred to the trust, while in fact it should be viewed from the standpoint of valuing the portion of the property transferred to the trust for Bryant. The trust instrument as interpreted by the Chancery Court of Hinds County provides that Bryant had a one-tenth interest in the properties listed in Schedule C unencumbered by any indebtedness. Therefore, the value of this portion of Bryant's interest in the trust was one-tenth of the value of the properties as listed in Exhibit C when transferred to the trust. The properties listed *294 on Exhibit C and their value when transferred to the trust on April 22, 1958, were as follows: Property
Value
Lee Estate Tract
$ 6,760.00
Dixie Tung Oil Company Tract
133,674.50
Clayton and Walter Mitchell and
W. J. Morris Tracts
93,000.00
A. B. Bryant Tract
250.00
James Hand Tract
28,080.00
Major-Sowers Sawmill Tract
1,100.00
J. O. Barron Tract
64,500.00
Total
$327,364.50
Therefore, the total value of the properties transferred to the trust should be reduced by $32,736.45 because of the transfer to the Bryant trust of an unencumbered one-tenth interest in the properties as listed on Exhibit C to the trust agreement. Bryant had a one-tenth interest in the remaining property transferred to the trust but these properties were subject to the payment of trust indebtedness just as were the properties transferred to the trusts for petitioner's wife, his daughter, and his son. The total value of the remaining properties in accordance with our conclusions herein is $655,097.70. From the evidence in this record the most reasonable basis for determining the value of this interest transferred to the trust for Bryant's to reduce the one-tenth of the value of *295 these properties applicable to Bryant's trust by the computed amount of the indebtedness applicable to such proportion. Since no better basis is shown by the evidence for making this computation we have allocated the total indebtedness assumed of $458,175.90 between the properties as listed in Exhibit C and the other properties on the basis of the value of each. Since the value of the properties listed on Exhibit C is approximately one-third of the value of all the properties transferred to the trust we have considered one-third of the indebtedness assumed by the trust to be applicable to these properties and two-thirds to be applicable to the other properties. On this basis we conclude that the value of the Bryant trust is $67,701.16 computed as follows: The $32,736.45 representing one-tenth of the value of properties listed on Exhibit C plus $65,509.77 representing one-tenth of the value of other properties transferred to the trust less $30,545.06 representing one-tenth of two-thirds of the indebtedness assumed by the trust. Having made this reduction in the exclusion for Bryant's trust, the full indebtedness is subtracted from the remaining value of the properties transferred *296 to the trust. Decisions will be entered under Rule 50. Footnotes
1. Some of these were transfers by petitioner to the ultimate grantee after the trustees transferred the property to petitioner.↩
2. We have not overlooked petitioner's argument based on our holding in E. Wheeler Bryant T.C. Memo. 1963-199↩, that there was no value to the $156,900. Petitioner does not contend that the Bryant case estops respondent from taking the position he takes in the instant case and therefore we do not consider that the findings and evidence in that case are pertinent to this case. The instant case must be decided on the facts in its record.